Judge Graham
delivered the opinion of the Court.
This is an action of assumpsit by Gibson to recover of Elliott the sum of $100 for apprehending, in the State of Indiana, a fugitive slave, the property of the defendant, and delivering him to the defendant at *439 his residence, in Louisville, in this State. The defendant’s demurrer to the declaration was overruled. The jury, on the trial of the issue of non-assumpsit, found for the plaintiff one hundred dollars in damages. A new trial was refused the defendant, who has brought the case to this Court for revision, and assigns for error—
Where a statute gives a remedy, though debt is most usually-brought, yet if the statute prescribe no form of remedy, assumpsit may be bro’t: (1 Chit. Plead., 120; Bullere N. P. 129.),
1. Overruling the demurrer.
2. Refusing instructions asked for by defendant.
3. In refusing to grant a new trial.
The only objection taken to the declaration is, that the action, being founded on a statute, should have been in debt, instead of assumpsit. A statute is in some respects considered a specialty, and debt is frequently, perhaps generally, the remedy prescribed for the recovery of any money due to the plaintiff, under its provisions under Contract or quasi contract ; but when the statute does not prescribe the remedy, assumpsit may be supported, the plaintiff not being by it restricted to any particular remedy: (1 Chitty’s Pleadings, 120; Buller, N. P. 129.) The declaration is in apt form, and we think the demurrer to it was properly overruled. The Court refused, as we suppose properly, to instruct the jury as in case of a non-suit. The testimony was at least strong enough to require the Court to leave its weight to the consideration of the jury. Eight other instructions were asked by the defendant, and refused by the Court. The 2d, 3d, 4th, 5th and 6th, bring in question, the constitutionality of an act of the Legislature of this State, approved Februa■ry 8th, 1838, which enacts “that the compensation for apprehending fugitive slaves taken without this Commonwealth, and in a State where slavery is not tolerated by law, shall be one hundred dollars, on 'the delivery to the owner, at his residence, within the Commonwealth, and seventy-five dollars if lodged in the jail of any county in this Commonwealth, and the owner be notified so as to be able to reclaim the slave.” By the 7th, the Court was asked to instruct the jury “that if the slave, after being brought to Louisville, escaped *440 from the plaintiff before being delivered by him to the defendant, and the plaintiff abandoned the immediate pursuit of said negro, even though the negro was subsequently arrested by plaintiff and by him delivered to the defendant, they should find for the defendant.” The 8th embraces the same idea, with the addition that if the subsequent arrest was by some one else than the plaintiff, no arrangement between plaintiff and that person can so connect the second arrest with the first, as to entitle the plaintiff to recover for the arrest in Indiana. The 9th asked for, told the jury that if after thenegroe’s escape in Louisville, the plaintiff abandoned the immediate pursuit, and the negro was arrested by Yanseildes, and said last arrest was recognized by plaintiff and defendant as the arrest of Vanseikles, they must find for defendant.
If a runaway ■slave from Kentucky be arrest-ad in Indiana, * 'brought to Kentucky, and es■eape from the .person apprehending, the taker up in Indiana may demand the slave from ■•any person apprehending in Kentucky, and ■'has aright to the reward due for apprehending in Indiana, upon •delivering him to the owner in Kentucky.
It seems to us that the proof, although somewhat uncertain, was sufficient to authorize the jury to find that the plaintiff had arrested the defendant’s runaway slave in Indiana, and that after being by him brought to Louisville the negro escaped.
We'think the proof would not justify the inference that the plaintiff had abandoned the pursuit of the fugitive ; on the contrary -the evidence is pretty clear, that having two other runaways in 'his charge, he, as soon as he could, and did deliver them to the jailer, ■immediately commenced searching for the negro in the -part of the city in which the slave had eluded his grasp. >It seems tó us, also, that having as far as he could do, ■rendered the service, contemplated by the statute, that is an’ested a fugitive slave in another State, and brought him to the city in which the owner lived, he had, by these acts, acquired such an interest in the slave as to authorize him, upon the recapture, under -the circumstances detailed in this case, and delivery to the owner, to demand the reward to which, by law, he would have been entitled, had the escape from him not have taken place, and that he was as quasi owner for the time being, liable to Vanseikles for the reward due to him for apprehending the runaway in Louisville. It seems to *441 us, therefore, that the evidence did not authorize the instructions asked for, and numbered 7,8, 9, and that the Court did not err in refusing them. The main question, however, in this cause is whether the act before mentioned, is in conflict with the constitution of this State. If it be so, the plaintiff would not, as matter of law, be entitled to the sum of one hundred dollars, but only to such reward as the jury might have believed he reasonably deserved to have for the services rendered by him.
If the Legislature has not the power to fix a definite reward for taking up a runaway slave out of this State, we are unable to perceive their authority to have passed any of the numerous laws, to be found in our statutes, upon the subject of runaway slaves, estrays, and other similar subjects. During the existence of the colonial government, in Virginia, as early as 1748, a statute was enacted giving a fixed compensation for taking up a runaway slave, viz, if apprehended under ten miles from his home, a reward of 100 pounds of tobacco, and if over ten miles, then a reward of 200 pounds of tobacco. In the same year a fixed compensation was ordered to be paid to the taker up of stray horses, cattle, sheep, goats, hogs, boats, &c. After Kentucky was organized into a separate State, and before the adoption of the late constitution, the. Legislature in 1794 passed, and after the adoption of that instrument, did, from time to time, continue to enact, laws giving rewards to the taker up of estrays. By an act passed 16th January, 1798, a reward, increased by the distance which he might have to travel, was given to the apprehender of a runaway slave upon delivering him to his owner. This act, which was passed, as already stated, before the adoption of the constitution of 1799, remained undisturbed by any Legislative or judicial action, and continued in full force until very recently, when it was found that the compensation fixed by it was insufficient to effect its object. Escapes of slaves continued to increase and but few recaptures were made, because, as was supposed, of the inadequacy of *442 the reward allowed by law for such services, and therefore the Legislature in the year 1835, increased the compensation to ten dollars if'the fugitive was taken in the.State, and to thirty dollars if taken up out of this State. It was soon ascertained that, because of the odium which in the non-slaveholding States was visited upon those of their citizens who engaged in the apprehending of fugitives from other States, it was necessary to offer a greater reward, and such as would probably be sufficient to induce men to consult their own interests, regardless of the public sentiment around them. It cannot well be doubted • that to the owners of slaves generally, the act of 1838, already quoted, has operated very beneficially, not only because fugitives are more frequently now than formerly returned to their owners, but because the difficulty of final escape has had some tendency to prevent others from attempting it. While these and such like considerations have a strong tendency to sustain the laws giving compensation in such cases, we do not doubt either the power or absolute duty of the Courts to declare them altogether null and void, if, in their opinion, the organic law of the commonwealth forbids such enactments. “By the constitution of Kentucky the legislative power of this commonwealth, that is, all the legislative power subordinate to the constitution, is vested in the General Assembly, subject to such restrictions as are expressed or necessarily implied in other parts of the constitution, and to such as are imposed by the constitution of the United States.” (9 B. Mon. 333.) It has in this case been argued that the law under consideration is. in conflict with the constution. First, because the right of trial by jury to assess the damages or determine upon the amount of the defendant’s indebtedness, is taken away by it. Second, because the statute fixes the amount to be recovered from defendant, thereby making a contract for him, and imposing upon him its terms whether he wills it or not, and thereby depriving him of his property without compensation. Third, because, if the Legislature can make a contract *443 for an individual and fix his liability at $100, they can as well fix it at $1000, or more.
The statute of 1838, giving a reward for apprehending runaway slaves is not unconstitutional, & the owner receiving his slave so apprehended, is hound for it.
We do not perceive that these suggestions ought to bring us to the conclusion that the act in question violates, in any particular, the organic law of the State. The constitution secures to every citizen “the ancient mode of trial by jury.” This provision does not give the right of a jury trial'in all cases, but secures it only in that class of cases where the right to demand a jury existed before the adoption of the constitution. This statute does not deprive a party of the .right to have the facts of his case, tried by a jury, on the contrary, the facts are to be tried by a jury, and then if the facts give to the plaintiff a just claim to reward for apprehending the fugitive, the law declares what that reward shall be. It is true that the act fixing the compensation does not, in its terms, make the payment of the reward dependant on the fact of the reception of the slave by his owner, and it is a question of very serious import whether the Legislature have not transcended their legitimate powers, if they intended by that act to impose on the owner the necessity of paying the sum fixed, notwithstanding he might much prefer yielding up entirely all claim to the services of his negro rather than pay for. his delivery a sum greater, perhaps, than his actual value. That portion of the act which ■ provides that if the fugitive slave shall be lodged in the jail of any county in this commonwealth, and the owner be notified so as to reclaim " the slave, he shall pay to the taker up the sum of seventy-five dollars, seems to make it imperative upon him to pay the latter sum, although he may be unwilling to receive back his slave, even without the payment of any reward, and, pei’haps, the whole act must, with a proper regard to the force of language, receive that construction.- The Legislature no doubt have the power to prohibit any person from turning loose his property, of any kind, so as thereby to create a nuisance injurious to the community, but we suppose that, except for some such cause, they cannot compel any one to receive back to *444 his service or use, such as he may choose to abandon, and we should very seriously doubt the constiutionality of this act, so far as it may be rightfully construed to be compulsory on the owner of. a slave to pay the reward to the taker up of the runaway, whether he will or not again consent to lay claim to the property. We are not, however, at present, called upon by the facts of this case to decide this delicate question. It is proved that Elliott cheerfully received his slave from Gibson, and 'professed himself willing to compensate him. No controversy arose as to the amount of compensation until after the slave had been surrendered to the custody of the owner.
Tbs Legislature have power to a•ward interest for jailing to pay money due upon contracts.
After the day of payment of a pecuniary obligation has elapsed, the law imposes on the debtor the duty to pay an interest of six per centum per annum, and it is not doubted that the Legislature'can increase that rate, from time to time, in reference to future contracts, as they may think expedient to the general good. No man is compelled to borrow money, or incur a demand which will bear interest; but if he does enter into such an obligation, although nothing be said as to interest, he tacitly and impliedly takes upon himself the promise and duty 'to pay the interest prescribed by the Legislature, although he may deem it exorbitant, and it may be in fact ruinous to him to pay it. The county Surveyor is by law entitled to demand certain fees for making surveys of lands. He who employs the services of this officer, is bound to pay him the legal fees, although no such agreement be made, and although he may thus be compelled to pay more than would have been exacted by a private and equally skilful surveyor.
These cases are not precisely analagous to the one before us, but they tend to illustrate our position, which is this, that although the owner of the fugitive may not be under any obligation of duty to receive him from the hands of the taker up, yet if he does so, he, by the act of reception, enters into a compact to pay the prescribed reward, which has been, perhaps, the sole inducement on the part of the other to take upon himself the *445 trouble and responsibilty of apprehending the slave. As soon as the slave has escaped to the opposite shore of the Ohio, he finds himself in a land, where the institution and existence of slavery is not recognized, and unless some one shall aid the owner in his apprehension, he will most probably never be retaken.
It is argued that if the owner desires the recovery of his slave, he should offer such a reward as he may be willing to pay, and the captor should look only to the compensation so offered by the owner. Such an offer would probably be known to very few of the citizens of the State to which the negro may have escaped. Even after the owner may have, at great trouble and expense, posted advertisements through the country, it might be a curious subject of enquiry how long they would probably be permitted to remain to meet the observation of such as would be induced by it to undertake the recapture. On the other hand, the public law of a sister State upon that subject may become a topic of conversation, and very readily known to all. One person having apprehended a runaway, and obtained the $100, his neighbors soon learn that he received that sum by reason of a law of Kentucky requiring the owner to pay it; and thus a few instances will soon diffuse the information through a whole community, and the people reposing confidence in the good faith of Kentucky, will apprehend the runaway and restore him to his owner, when, under other and different circumstances, he might be permitted to escaj)e.
It is argued, also, that some future Legislature may, by the requisition of extravagant rewards, impose on the slave owner burdens grievions to be^ borne. That may be true, not only as to compensation for the apprehension of runaways, but as to other subjects connected with the institution of slavery. Should such events occur, it will then be time enough for the Courts to entertain the question whether a flagrant abuse of their powers avoids their act. Such a question, we think, is not presented in this case.'
Russeau Sf Elliott for plaintiff; Guthrie Tyler for defendant.
Although this act may, in some rare instances, operate injuriously, yet its general effect is no doubt to the benefit of the people of this commonwealth.
It has been urged in argument that the effect of the act is to take from one man his property and give it to another. We do not so regard it. Its sole object and effect is to restore property already lost.
We do not perceive that the act in question is either a violation of any provision or principle of the constitution, or that it is so palpably and flagrantly unjust as to justify the judicial tribunals in refusing to enforce it.
Not perceiving any error in the action of the Circuit Court,.the judgment is, therefore, affirmed.